# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 05-3093

_____

| | | |
|---|---|---|
| Planned Parenthood Minnesota, North Dakota, South Dakota; Carol E. Ball, M.D., | * * * * | |
| Appellees, | * * | |
| v. | * * | |
| Mike Rounds, Governor, in his official capacity; Larry Long, Attorney General, in his official capacity, | * * * * * | Appeal from the United States District Court for the District of South Dakota. |
| Appellants, | * * | |
| Alpha Center; Black Hills Crisis Pregnancy Center, doing business as Carenet; Dr. Glenn A. Ridder, M.D.; Eleanor D. Larsen, M.A., LSWA, | * * * * * * | |
| Intervenors on Appeal. | * | |

_____

Submitted: April 11, 2007
Filed: June 27, 2008

_____

Before, LOKEN, Chief Judge, WOLLMAN, MURPHY, BYE, RILEY, MELLOY, SMITH, COLLOTON, GRUENDER, BENTON and SHEPHERD, Circuit Judges, en banc.

_____

GRUENDER, Circuit Judge.

The Governor and Attorney General of South Dakota ("the State"), along with the intervenor crisis pregnancy centers, appeal the district court's preliminary injunction preventing the 2005 version of South Dakota's statute regulating informed consent to abortion from becoming effective. For the reasons discussed below, we vacate the preliminary injunction and remand to the district court for further proceedings.

I.

In 2005, South Dakota enacted House Bill 1166 ("the Act"), amending the requirements for obtaining informed consent to an abortion as codified in S.D.C.L. § 34-23A-10.1. Section 7 of the Act requires the performing physician to provide certain information to the patient as part of obtaining informed consent prior to an abortion procedure and to certify that he or she believes the patient understands the information. The provisions of § 7 relevant to the preliminary injunction are as follows (emphases added):

> No abortion may be performed unless the physician first obtains a voluntary and informed written consent of the pregnant woman upon whom the physician intends to perform the abortion, unless the physician determines that obtaining an informed consent is impossible due to a medical emergency and further determines that delaying in performing the procedure until an informed consent can be obtained from the pregnant woman or her next of kin in accordance with chapter 34-12C is impossible due to the medical emergency, which determinations shall then be documented in the medical records of the patient. A consent to an abortion is not voluntary and informed, unless, in addition to any other information that must be disclosed under the common law doctrine, the physician provides that pregnant woman with the following

-2-

information:

(1) A statement in writing providing the following information:

(a) The name of the physician who will perform the abortion;

(b) *That the abortion will terminate the life of a whole, separate, unique, living human being*;

(c) *That the pregnant woman has an existing relationship with that unborn human being and that the relationship enjoys protection under the United States Constitution and under the laws of South Dakota*;

(d) *That by having an abortion, her existing relationship and her existing constitutional rights with regards to that relationship will be terminated*;

(e) A description of all known medical risks of the procedure and statistically significant risk factors to which the pregnant woman would be subjected, including:

(i) Depression and related psychological distress;

(ii) Increased risk of suicide ideation and suicide;

\* \* \*

\* \* \*

(2) A statement by telephone or in person, by the physician who is to perform the abortion, or by the referring physician, or by an agent of both, at least twenty-four hours before the abortion, providing the following information:

(a) That medical assistance benefits may be available for prenatal care, childbirth, and neonatal care;

(b) That the father of the unborn child is legally responsible to provide financial support for her child following birth, and that this legal obligation of the father exists in all instances, even in instances in which the father has offered to pay for the abortion;

*(c) The name, address, and telephone number of a pregnancy help center in reasonable proximity of the abortion facility where the abortion will be performed*; . . .

\* \* \*

[¶ 2] Prior to the pregnant woman signing a consent to the abortion, she shall sign a written statement that indicates that the requirements of this section have been complied with. *Prior to the performance of the abortion, the physician who is to perform the abortion* shall receive a copy of the written disclosure documents required by this section, and *shall certify in writing that all of the information described in those subdivisions has been provided to the pregnant woman, that the physician is, to the best of his or her ability, satisfied that the pregnant woman has read the materials which are required to be disclosed, and that the physician believes she understands the information imparted.*

In addition, § 8(4) of the Act amended S.D.C.L. § 34-23A-1 to define "Human being" for the purposes of the informed-consent-to-abortion statute as "an individual living member of the species of Homo sapiens, including the unborn human being during the entire embryonic and fetal ages from fertilization to full gestation."  A physician who violates the Act knowingly or in reckless disregard is guilty of a Class 2 misdemeanor.  S.D.C.L. § 34-23A-10.2.

Planned Parenthood Minnesota, North Dakota and South Dakota and its medical director Carole E. Ball, M.D. (collectively "Planned Parenthood") sued to prevent the Act from taking effect, claiming that the disclosure requirements in § 7(1)(b)-(d) and the physician certification requirement in § 7 ¶ 2 violate physicians' free speech rights; that the disclosure requirements in §§ 7(1)(e)(i)-(ii) and (2)(c) are unconstitutionally vague in that they fail to give physicians adequate notice of the conduct proscribed; that being subjected to the disclosures in § 7(1)(b)-(d) unduly burdens patients' rights to an abortion and violates their free speech rights; and that § 7 unduly burdens patients' right to an abortion because its health exception is inadequate.

-4-

In June 2005, Planned Parenthood moved for a preliminary injunction to prevent the Act from taking effect as scheduled on July 1, 2005. In support of the argument that §§ 7(1)(b)-(d) would violate physicians' free speech rights by compelling them to deliver the State's ideological message, rather than truthful and non-misleading information relevant to informed consent to abortion, Planned Parenthood's evidence consisted solely of affidavits from Dr. Ball and bioethicist Paul Root Wolpe, Ph.D. In her affidavit, Dr. Ball described her professional background, including a board certification in obstetrics and gynecology. Without elaboration, Dr. Ball stated that the disclosures in §§ 7(1)(b)-(d) "are statements of ideology and opinion, not medicine or fact." Ball Aff. ¶ 2. Dr. Ball also stated that she would be unable to clarify the disclosures upon a patient's request, as required by § 7, "because these are not medical statements or facts that I am trained as a Medical Doctor to address." *Id.* ¶ 4. The affidavit made no reference to the Act's definition of "human being" in § 8(4).

Dr. Wolpe's affidavit included a curriculum vitae detailing his expertise in "the area of ideology in medicine and bioethics." Wolpe Aff. ¶ 1. Dr. Wolpe stated that the proposition "that from the moment of conception, an embryo or fetus is a 'whole, separate, unique, living human being' . . . is not a scientific or medical fact, nor is there a scientific or medical consensus to that effect." *Id.* ¶¶ 2, 3. Dr. Wolpe further averred that "to describe an embryo or fetus scientifically and factually, one would say that a living embryo or fetus in utero is a developing organism of the species Homo Sapiens which may become a self-sustaining member of the species if no organic or environmental incident interrupts its gestation." *Id.* ¶ 6.

In its opposition to the motion for preliminary injunction, the State introduced portions of the Act's legislative history[1] and several affidavits. The legislative history includes testimony from several women who had obtained abortions in South Dakota and felt their decisions would have been better informed if they had received from their abortion providers the information required by § 7. In addition, the legislative history includes testimony from experts such as Marie Peeters-Ney, M.D., a physician and geneticist, explaining the scientific basis for the disclosure required by § 7(1)(b) that "the abortion will terminate the life of a whole, separate, unique, living human being." Dr. Peeters-Ney testified that use of the term "human being" was accurate because:

> Becoming a member of our species is conferred immediately upon conception. At the moment of conception a human being with 46 chromosomes comes into existence. These chromosomes, the organization, the chromosomal pattern is specifically human. The RNA, the messenger protein, the proteins are distinctly human proteins. So this new human being is a member of our species, and humanity is not acquired sometime along the path, it occurs right at conception.

Senate State Affairs Comm. Hearing at 25. Dr. Peeters-Ney also stated that an embryo or fetus is whole in the sense that "[a]ll the genetic information sufficient and necessary to mature, and the information that is needed for this human being's entire life is present at the time of conception"; that it is "separate from the mother" because "[t]he genetic program is totally complete and this human being will mature according to his or her own program"; and that it is unique because it has "a totally unique genetic code." *Id.* at 25-26.

---

[1]*See* Hearing on House Bills 1166 and 1233 Before the House State Affairs Comm. (S.D. Feb. 9, 2005); Hearing Re: House Bills 1166, 1233, 1249 Before the Senate State Affairs Comm. (S.D. Feb. 23, 2005).

The State augmented the points raised in the legislative history with eight affidavits from medical experts and eight from women who had undergone abortions or worked at crisis pregnancy centers. For example, David Fu-Chi Mark, Ph.D., a molecular biologist employed in the pharmaceutical industry, stated that the Act's definition of "human being" as an "'individual living member of the species Homo sapiens,' including human beings living in utero, makes it clear that the statement under [§ 7(1)(b)] is stated as a scientific fact and nothing more. As such, it is truthful and scientifically accurate." Mark Aff. ¶ 1. The affidavit described in detail the DNA and RNA science supporting the accuracy of the statement. Similarly, Bruce Carlson, M.D., Ph.D., a professor of medicine and author of a widely used textbook on human embryology, stated that "[t]he post implantation human embryo is a distinct individual human being, a complete separate member of the species *Homo sapiens*, and is recognizable as such." Carlson Aff. ¶¶ 1, 5.

The district court held a hearing on the motion for preliminary injunction. Planned Parenthood argued that patients receiving the disclosure in § 7(1)(b) would never receive the limited statutory definition of "human being." Prelim. Inj. Mot. Hr'g (June 28, 2005) Tr. at 20; *see id.* at 25 ("If you want to talk about Homo sapiens, and go on and talk about there is a developing organism that is unique, that may be correct. That is not what the State's message attempts to do here."). Planned Parenthood contended that, as a result, patients would understand the plain meaning of "whole, separate, unique, living human being" to mean a "person" in the fullest moral and legal sense and that this compelled disclosure that a fetus or embryo is a "person" would violate *Roe v. Wade*[2] and its progeny. *Id.* at 20-21. Planned Parenthood likewise argued that §§ 7(1)(c) and (d) were infirm based on their reference to the fetus or embryo as a "human being." *Id.* at 23. Planned Parenthood also asserted that the Act's certification requirement would not allow the physician to disassociate himself or herself from the Act's ideological message. *Id.* at 13.

---

[2]410 U.S. 113 (1973).

-7-

The State responded that every patient would receive the definition that "human beings are defined as members of the species Homo sapiens" because "that's right in the statute." *Id.* at 46. With regard to disassociation, the State contended that "all [the physician] has to do is explain that basic scientific fact and then he can go on and have any kind of discussion about philosophy, theology or morality, or whatever it is that he wants to talk about. . . . [The physician's] only obligation is regarding this narrow scientific fact." *Id.* at 47.

The district court, applying our *Dataphase*[3] test, granted a preliminary injunction based on its finding that Planned Parenthood had a fair chance of success on its claim that § 7(1)(b) violated physicians' free speech rights and that the balance of harms favored Planned Parenthood. *See Planned Parenthood v. Rounds*, 375 F. Supp. 2d 881 (D.S.D. 2005). The district court apparently accepted the argument that the Act's limited definition of "human being" would not be included in any disclosure, or, if included, would have no effect on the patient's understanding of the term, finding that the Act

> requires abortion doctors to enunciate the State's viewpoint on an unsettled medical, philosophical, theological, and scientific issue, that is, whether a fetus is a human being. *See Roe v. Wade*, 410 U.S. 113, 159, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1972) (the word person as used in the Fourteenth Amendment does not include the unborn); [*Planned Parenthood of Southeast Pennsylvania v. Casey*, 505 U.S. 833, 913 (1992)] (Stevens, J., concurring) (fetus is a developing organism that is not yet a person).

---

[3]*Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc) (holding that issuance of a preliminary injunction depends upon a "flexible" consideration of (1) the threat of irreparable harm to the moving party; (2) balancing this harm with any injury an injunction would inflict on other interested parties; (3) the probability that the moving party would succeed on the merits; and (4) the effect on the public interest).

*Id.* at 887. The district court also emphasized the absence of a provision in the Act expressly allowing physicians to disassociate themselves from the required disclosures. *Id.* Citing § 10 of the Act, which states that the prior version of S.D.C.L. § 34-23A-10.1 should remain in effect if "the provisions" of § 7 of the Act are preliminarily enjoined, the district court also preliminarily enjoined §§ 7(1)(c)-(e), (2) and ¶ 2 without any further analysis. *Id.* at 889. The two crisis pregnancy centers and their members intervened in the case in July 2005 and participated in the briefing and argument of this matter on appeal. After a divided panel of this court affirmed the grant of the preliminary injunction, we elected to grant rehearing en banc.

II.

We have jurisdiction under 28 U.S.C. § 1292(a)(1) to review an interlocutory order granting a preliminary injunction. In granting the preliminary injunction, the district court, applying our circuit precedent based on *Dataphase*, analyzed likelihood of success on the merits in terms of whether Planned Parenthood had a "fair chance of prevailing" on the merits, with a "fair chance" meaning something less than fifty percent. *Planned Parenthood*, 375 F. Supp. 2d at 885. Using this standard, the district court preliminarily enjoined an entire state statute based on two short affidavits that, as we discuss in detail in the following section, simply presumed that a key statutory definition would be ignored. As explained below, however, under our *Dataphase*-based precedent, the "fair chance" standard should not be applied to motions to preliminarily enjoin the enforcement of a state statute. Instead, we now clarify that, where a preliminary injunction of a duly enacted state statute is sought, we require a more rigorous threshold showing that the movant is likely to prevail on the merits.

We begin with a brief history of the showing of likelihood of success on the merits required for the issuance of a preliminary injunction in our circuit. Prior to 1978, we required any party seeking a preliminary injunction to show a "substantial

probability of success at trial." *Fennell v. Butler*, 570 F.2d 263, 264 (8th Cir. 1978). This requirement, in combination with a showing that irreparable injury would occur absent the injunction, was referred to as the "traditional test[]." *Id.*; *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) ("The traditional standard for granting a preliminary injunction requires the plaintiff to show that in the absence of its issuance he will suffer irreparable injury and also that he is likely to prevail on the merits."). The Second Circuit rule at that time was that a preliminary injunction should issue "only upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Gresham v. Chambers*, 501 F.2d 687, 691 (2d Cir. 1974) (quotation omitted). While the first prong of the Second Circuit's test mirrored our circuit's traditional test, the second prong had no analog in our circuit. In *Fennell*, after a district court found that no preliminary injunction should issue under our traditional test, a panel of this court remanded with instructions to consider whether a preliminary injunction should issue under the second prong of the Second Circuit test. *Fennell*, 570 F.2d at 264. After *Fennell*, district courts in our circuit began to analyze motions for preliminary injunctions under both the traditional test and the alternative second-prong test adopted from the Second Circuit. *See Dataphase*, 640 F.2d at 114 n.1 (Ross, J., concurring) (collecting cases demonstrating the "confusion in the district courts").

Our court en banc endeavored to unify the two tests in *Dataphase*. As a result of the unification, the alternative test adopted from the Second Circuit effectively displaced the traditional test's threshold requirement of showing a "substantial probability" of success at trial. *Dataphase* rejected the notion that the party seeking relief must show "a greater than fifty per cent likelihood that he will prevail on the merits," holding instead that "where the balance of other factors tips decidedly toward plaintiff a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation." *Dataphase*, 640 F.2d at 113.

-10-

We note that the Second Circuit, the source of our *Dataphase* "fair chance" standard, applies only its more rigorous analog to our traditional test, rather than its

less rigorous analog to the *Dataphase* "fair chance" test, where a preliminary injunction of the implementation of a statute is sought:

> Where the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous fair-ground-for-litigation standard and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim.

*Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995) (per curiam) (quoting *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989)); *accord Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) ("[T]he Second Circuit has held, and we agree, that where a preliminary injunction seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the less rigorous fair-ground-for-litigation standard should not be applied.") (internal quotations and alterations omitted); *but see Rodde v. Bonta*, 357 F.3d 988, 994 n.8 (9th Cir. 2004) (declining to apply a more rigorous standard for likelihood of success on the merits on a motion to preliminarily enjoin "legislative action taken by a duly appointed public body").

We expressly adopted the Second Circuit's reasoning in *Richenberg v. Perry*, 73 F.3d 172 (8th Cir. 1995) (per curiam), holding that "a substantial likelihood of success on the merits . . . must be the standard when considering whether to grant a preliminary injunction preventing the implementation of a statute that was the product of lengthy public debate involving both Congress and the President." *Id.* at 172-73 (citing *Able*); *see also Jensen v. Dole*, 677 F.2d 678, 679-80 (8th Cir. 1982) (per curiam) (evaluating, in accord with *Dataphase*, a motion for preliminary injunction

-11-

of the enforcement of a federal statute using the traditional test's requirement for a "substantial probability"of success on the merits). Nevertheless, we more recently have characterized the *Dataphase* standard for likelihood of success on the merits as requiring a showing of a "substantial likelihood," *e.g. Kai v. Ross*, 336 F.3d 650, 656 (8th Cir. 2003), or a "fair chance," *e.g. Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003), of success on the merits without explaining whether these two standards are substantively different or why one was chosen instead of the other for a particular case. We now reaffirm *Richenberg*'s adoption of the Second Circuit's reasoning and clarify that a party seeking a preliminary injunction of the implementation of a state statute must demonstrate more than just a "fair chance" that it will succeed on the merits. We characterize this more rigorous standard, drawn from the traditional test's requirement for showing a likelihood of success on the merits, as requiring a showing that the movant "is likely to prevail on the merits." *Doran*, 422 U.S. at 931; *see also Able*, 44 F.3d at 131 (requiring the movant to show "*a likelihood that he will succeed* on the merits of his claim") (emphasis added).[4] As

---

[4]The Eighth Circuit's pre-*Dataphase* phrasing of this element of the traditional test, a "substantial probability" of success on the merits, typically was satisfied by a showing of a greater than fifty percent probability of success. *See, e.g.*, *Modern Controls, Inc. v. Andreadakis*, 578 F.2d 1264, 1269 (8th Cir. 1978) (applying the traditional test and concluding "that Modern Controls *would probably succeed* on the merits because, on the basis of the evidence before the Court, the covenant not to compete was enforceable") (emphasis added); *Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 868 (8th Cir. 1977) (applying the traditional test and concluding that "it appears *probable* that Planned Parenthood *will prevail* on its claim that the ordinance is invalid") (emphasis added). There was some disagreement in *Dataphase*, however, on the traditional meaning of "substantial probability." *Compare* 640 F.2d at 113 ("*Some* have read this element of the [traditional] test to require in every case that the party seeking preliminary relief prove a greater than fifty per cent likelihood that he will prevail on the merits.") (emphasis added), *with id.* at 115 (Ross, J., concurring) (stating that the term "probability of success" must "mean a greater than fifty percent likelihood that the requesting party will prevail. If the courts which have used that phrase did not mean it to imply a better chance of prevailing than of not prevailing, they would have used the word

the *Able* court explained, a more rigorous standard "reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able*, 44 F.3d at 131. If the party with the burden of proof makes a threshold showing that it is likely to prevail on the merits, the district court should then proceed to weigh the other *Dataphase* factors. *See Dataphase*, 640 F.2d at 113.[5]

In conclusion, we emphasize that district courts should still apply the familiar "fair chance of prevailing" test where a preliminary injunction is sought to enjoin something other than government action based on presumptively reasoned democratic processes. Only in a case such as this one, where a preliminary injunction is sought to enjoin the implementation of a duly enacted state statute,[6] must district courts make

'possibility' or another word of a similar meaning. I cannot agree to this illogical exercise in semantics."). To avoid the long and uncertain history associated with the terms "substantial probability" and "substantial likelihood" of success, we adopt the Supreme Court's phrasing, "likely to prevail on the merits." *See Doran*, 422 U.S. at 931.

[5]Our focus on likelihood of success on the merits as a threshold issue should not be construed to lessen the importance of irreparable harm in the *Dataphase* analysis. "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959). Indeed, in some cases, lack of irreparable injury is the factor that should begin and end the *Dataphase* analysis. *See Adam-Mellang v. Apartment Search, Inc.*, 96 F.3d 297 (8th Cir. 1996). In this respect, where a duly enacted statute is involved, a likelihood of success on the merits may be characterized as one, but not the only, threshold showing that must be met by a movant for a preliminary injunction.

[6]Although only a state statute is before us, our reasoning obviously indicates that the "likely to prevail on the merits" test, rather than the "fair chance" test, also should apply to the analysis of motions for preliminary injunctions of the enforcement of federal statutes. Where preliminary injunctions are sought to enjoin city ordinances

a threshold finding that a party is likely to prevail on the merits. By re-emphasizing this more rigorous standard for demonstrating a likelihood of success on the merits in these cases, we hope to ensure that preliminary injunctions that thwart a state's presumptively reasonable democratic processes are pronounced only after an appropriately deferential analysis.

## III.

The district court granted the preliminary injunction based solely on Planned Parenthood's claim that § 7(1)(b) violates physicians' First Amendment rights to be free from being compelled to speak.[7] We review that decision for an abuse of discretion. *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006). "An abuse of discretion occurs where the district court rests its conclusion on clearly erroneous factual findings or erroneous legal conclusions." *Id.* at 503-04. In the instant case, the district court rested its conclusion on an error of law when it ignored the statutory definition of "human being" in § 8(4) of the Act. Taking into account the statutory definition, we find that Planned Parenthood's evidence at the preliminary injunction stage does not demonstrate that it is likely to prevail on the merits.

---

or administrative actions by federal, state or local government agencies, we note that the Second Circuit has examined the circumstances surrounding such government actions to determine to what extent the challenged action represents "the full play of the democratic process" and, thus, deserves the deference of the traditional test. *See Able*, 44 F.3d at 131-32.

[7]Planned Parenthood also advanced several other grounds in support of its motion for preliminary injunction. Because the district court's order addressed only the compelled speech challenge to § 7(1)(b), we limit our en banc review to that ground. *See Jader v. Principal Mut. Life Ins. Co.*, 925 F.2d 1075, 1076 n.1 (8th Cir. 1991). On remand, the district court may, in its discretion, address the other arguments in support of the preliminary injunction in the first instance.

We first examine the contours of the right not to speak. "[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). In general, to address a claim that a state action violates the right not to speak, a court first determines whether the action implicates First Amendment protections. *Id.* at 715. If it does, the court must determine whether the action is narrowly tailored to serve a compelling state interest. *Id.* at 716. "[W]here the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." *Id.* at 717.

In *Planned Parenthood of Southeast Pennsylvania v. Casey*, the Supreme Court held that "a requirement that a doctor give a woman certain information as part of obtaining her consent to an abortion" implicates a physician's First Amendment right not to speak, "but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State." 505 U.S. 833, 884 (1992) (plurality opinion).[8] However, the Court found no violation of the physician's right not to speak, without need for further analysis of whether the requirements were narrowly tailored to serve a compelling state interest, *id.*, where physicians merely were required to give "truthful, nonmisleading information" relevant to the patient's decision to have an abortion, *id.* at 882. Significantly, information deemed relevant in *Casey* was not limited to information about the medical risks of the procedure itself; the State also required the physician to inform the patient that the father of her child would be liable for child support and that other agencies and organizations offered alternatives to

___

[8]We have adopted the standards enunciated by the *Casey* plurality opinion as controlling precedent in abortion cases. *Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1456 n.7 (8th Cir. 1995) (recognizing the plurality opinion "as the Supreme Court's definitive statement of the constitutional law on abortion"); *see also Stenberg v. Carhart*, 530 U.S. 914, 930 (2000) (applying, in a majority opinion, the undue burden standard from the *Casey* plurality opinion).

-15-

abortion. *Id.* at 881, 902-03. Such information was relevant because it "furthers the legitimate purpose of reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed." *Id.* at 882. Furthermore, the fact that the information "might cause the woman to choose childbirth over abortion" did not render the provisions unconstitutional. *Id.* at 883.

In the recent *Gonzales v. Carhart* decision, the Supreme Court reaffirmed in the context of abortion that "it is clear the State has a significant role to play in regulating the medical profession" and that "[t]he government may use its voice and its regulatory authority to show its profound respect for the life within the woman." 550 U.S. ---, 127 S. Ct. 1610, 1633 (2007). The Court described in detail the State's interest in regulating the information provided by physicians prior to an abortion in the context of partial-birth abortion procedures:

> Whether to have an abortion requires a difficult and painful moral decision. While we find no reliable data to measure the phenomenon, it seems unexceptionable to conclude some women come to regret their choice to abort the infant life they once created and sustained. Severe depression and loss of esteem can follow.

> In a decision so fraught with emotional consequence some doctors may prefer not to disclose precise details of the means that will be used, confining themselves to the required statement of risks the procedure entails. From one standpoint this ought not to be surprising. Any number of patients facing imminent surgical procedures would prefer not to hear all details, lest the usual anxiety preceding invasive medical procedures become the more intense. This is likely the case with the abortion procedures here in issue.

> It is, however, precisely this lack of information concerning the way in which the fetus will be killed that is of legitimate concern to the State. The State has an interest in ensuring so grave a choice is well informed. It is self-evident that a mother who comes to regret her choice to abort

-16-

> must struggle with grief more anguished and sorrow more profound when she learns, only after the event, what she once did not know: that
>
> she allowed a doctor to pierce the skull and vacuum the fast-developing brain of her unborn child, a child assuming the human form.
>
> It is a reasonable inference that a necessary effect of the regulation and the knowledge it conveys will be to encourage some women to carry the infant to full term, thus reducing the absolute number of late-term abortions.

*Id.* at 1634 (citations omitted).

*Casey* and *Gonzales* establish that, while the State cannot compel an individual simply to speak the State's ideological message, it can use its regulatory authority to require a physician to provide truthful, non-misleading information relevant to a patient's decision to have an abortion, even if that information might also encourage the patient to choose childbirth over abortion. Therefore, Planned Parenthood cannot succeed on the merits of its claim that § 7(1)(b) violates a physician's right not to speak unless it can show that the disclosure is either untruthful, misleading or not relevant to the patient's decision to have an abortion.

Taken in isolation, § 7(1)(b)'s language "[t]hat the abortion will terminate the life of a whole, separate, unique, living human being" certainly may be read to make a point in the debate about the ethics of abortion. Our role, however, is to examine the disclosure actually mandated, not one phrase in isolation. Planned Parenthood's evidence and argument rely on the supposition that, in practice, the patient will not receive or understand the narrow, species-based definition of "human being" in § 8(4) of the Act, but we are not persuaded that this is so. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. ---, 128 S. Ct. 1184, 1190 (2008) ("[W]e must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases."). South Dakota recognizes the well-settled

canon of statutory interpretation that "[w]here [a term] is defined by statute, the statutory definition is controlling." *Bruggeman v. S.D. Chem. Dependency Counselor Certification Bd.*, 571 N.W.2d 851, 853 (S.D. 1997). The Supreme Court emphasized the controlling nature of statutory definitions in analyzing a Nebraska partial-birth abortion statute:

> When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning. *Meese v. Keene*, 481 U.S. 465, 484-485, 95 L. Ed. 2d 415, 107 S. Ct. 1862 (1987) ("It is axiomatic that the statutory definition of the term excludes unstated meanings of that term"); *Colautti v. Franklin*, 439 U.S. at 392-393, n. 10 ("As a rule, 'a definition which declares what a term 'means' . . . excludes any meaning that is not stated'") . . . .

*Stenberg v. Carhart*, 530 U.S. 914, 942 (2000).

Section 7(1) essentially requires the physician to deliver a written form to the patient and lists some, but not all, of the information that must be included on that form. For example, § 7(1)(e) requires the disclosure form to contain a "description of all known medical risks of the procedure," "including" certain subcategories; such language does not purport to establish the exact wording of the disclosure form. Nothing about the structure of § 7 supports the unusual proposition that the limiting statutory definition of a term used in the required disclosure should be ignored on the basis that it is stated in a separate "definitions" section. Given the well-recognized controlling nature of statutory definitions, it would be incumbent upon one preparing the disclosure form required by § 7(1), and upon a physician answering a patient's questions about it, to account for any applicable statutory definitions.

Once one accepts that the required disclosure must take into account the limiting definition in § 8(4), the evidence submitted by the parties regarding the truthfulness and relevance of the disclosure in § 7(1)(b) generates little dispute. The

disclosure actually mandated by § 7(1)(b), in concert with the definition in § 8(4), is "[t]hat the abortion will terminate the life of a whole, separate, unique, living human being," § 7(1)(b), and that "human being" in this case means "an individual living member of the species of Homo sapiens . . . during [its] embryonic [or] fetal age[]," § 8(4). The State's evidence suggests that the biological sense in which the embryo or fetus is whole, separate, unique and living should be clear in context to a physician, *cf. Gonzales*, 127 S. Ct. at 1627 ("[B]y common understanding and scientific terminology, a fetus is a living organism while within the womb, whether or not it is viable outside the womb."), and Planned Parenthood submitted no evidence to oppose that conclusion. Indeed, Dr. Wolpe's affidavit, submitted by Planned Parenthood, states that "to describe an embryo or fetus scientifically and factually, one would say that a living embryo or fetus in utero is a developing organism of the species Homo Sapiens which may become a self-sustaining member of the species if no organic or environmental incident interrupts its gestation." Wolpe Aff. ¶ 6. This statement appears to support the State's evidence on the biological underpinnings of § 7(1)(b) and the associated statutory definition. Planned Parenthood's only other evidence, Dr. Ball's affidavit, ignores the statutory definition of "human being." Finally, this biological information about the fetus is at least as relevant to the patient's decision to have an abortion as the gestational age of the fetus, which was deemed to be relevant in *Casey*. *See* 505 U.S. at 882. As a result, Planned Parenthood cannot meet even the less rigorous requirement to show a fair chance of prevailing, much less the more rigorous requirement applicable here to show that it is *likely* to prevail, on the merits of its claim that the disclosure required by § 7(1)(b) is untruthful, misleading or not relevant to the decision to have an abortion. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasizing that a preliminary injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of

persuasion" and presents proof even more substantial than that required on a motion for summary judgment) (quotation omitted).[9]

Planned Parenthood also contends that ¶ 2 of the Act, requiring the physician to certify in writing that he or she "believes [the patient] understands the information imparted," does not allow a physician to disassociate himself or herself from the required disclosure in § 7(1)(b). The ability to disassociate must be viewed in the context of the disclosure required. If a state-mandated disclosure is ideological in nature, the state could argue that, if the physician may completely disassociate himself or herself from the state's ideological message, then the physician's compelled speech rights are not implicated. *Cf. Rust v. Sullivan*, 500 U.S. 173, 200 (1991) (holding that regulations preventing physicians who participated in a federally funded program from discussing abortion with their program-funded patients did not violate the physicians' First Amendment rights because "[n]othing in [the regulations] requires a doctor to represent as his own any opinion that he does not in fact hold" and the effect of the regulations "cannot reasonably be thought to mislead a client into thinking that the doctor does not consider abortion an appropriate option for her"). On the other hand, neither *Casey* nor any other precedent of which we are aware suggests the proposition that, where a physician is required to disclose truthful and

_____

[9]The dissent recognizes that the term "human being" "may refer to purely biological characteristics." *Post* at 29. Section 8(4) of the Act does just that, defining "human being" as a "living member of the species Homo sapiens, including the unborn human being during the entire embryonic and fetal ages" for purposes of the required disclosure. Like the evidence submitted by Planned Parenthood, the dissent steadfastly ignores this biology-based definition and maintains that the required disclosure is ideological in nature and, therefore, unconstitutional. By ignoring the statutory definition of "human being," however, the dissent mischaracterizes the nature of the required disclosure and concludes that it compels a physician to answer the metaphysical question of when "human life" begins. Contrary to the dissent's analysis, the Act, when read in light of the nonmisleading statutory definition of "human being," does not require a physician to address whether the embryo or fetus is a "whole, separate, unique" "human life" in the metaphysical sense.

non-misleading information as part of obtaining informed consent to a procedure, the physician's ability to disassociate from that truthful and non-misleading information is relevant to the compelled speech analysis. Because Planned Parenthood has failed to demonstrate the requisite likelihood of success on its claim that the disclosure required by § 7(1)(b) is untruthful or misleading, it has not demonstrated that there is an ideological message from which physicians need to disassociate themselves.[10] Therefore, we need not reach the disassociation issue in the instant case.

_____

[10]We also have indicated that disassociation becomes relevant if the disclosure mandated by the state is generally truthful and non-misleading, but is misleading as to a particular patient due to her specific circumstances. *See Fargo Women's Health Org. v. Schafer*, 18 F.3d 526, 533-34 (8th Cir. 1994) (addressing, in the context of North Dakota's informed-consent-to-abortion statute, the potential falsity of a disclosure of the availability of medical assistance benefits and paternal child support due to "unique and personal background facts" of the patient). In *Schafer*, we concluded that physicians would be able to comment on the misleading nature of the disclosures in those instances, and we found that an express statutory provision allowing physicians to disassociate from the disclosures supported our conclusion. *Id.* at 534. Planned Parenthood correctly points out that, unlike the statute in *Schafer*, the Act has no express provision allowing disassociation. Planned Parenthood further argues again that the certification requirement in § 7 ¶ 2, requiring the physician to certify in writing "that the physician believes [the patient] understands the information imparted," effectively precludes the physician from disassociating.

This argument is unavailing because Planned Parenthood introduced no evidence that the disclosure in § 7(1)(b), with the statutory definition of "human being" incorporated, would become false or misleading due to the particular circumstances of some patients. By contrast, the plaintiff in *Schafer* provided affidavits, albeit conclusory ones, to demonstrate the potential falsity of the information on medical-assistance and child-support benefits in particular circumstances. *See* 18 F.3d at 533-34. In the absence of some showing that there are particular circumstances in which a successful abortion will do something other than terminate the life of a whole, separate, unique, living member of the species of Homo sapiens during its embryonic or fetal age, Planned Parenthood cannot demonstrate that the physician's ability to disassociate is implicated in this case.

-21-

Given Planned Parenthood's failure to produce sufficient evidence to establish that it is likely to prevail on the merits of its compelled speech claim, we need not address the remaining *Dataphase* factors.[11]  In summary, the district court abused its discretion by failing to give effect to the statutory definition of "human being" in § 8(4) of the Act.  Planned Parenthood's evidence at the preliminary injunction stage does not establish a likelihood of proving that, with the definition incorporated, the disclosure required by § 7(1)(b) is anything but truthful, non-misleading and relevant to the patient's decision to have an abortion, and thus "part of the practice of medicine, subject to reasonable licensing and regulation by the State."  *Casey*, 505 U.S. at 884.  Accordingly, we vacate the preliminary injunction entered on compelled speech grounds by the district court.

---

[11]Our characterization of the requirement for the movant to show that it is likely to prevail on the merits as a "threshold" simply reflects that the court's consideration of the remaining *Dataphase* factors cannot tip the balance of harms in the movant's favor when the requirement is not satisfied.  We acknowledge that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Kirkeby v. Furness*, 52 F.3d 772, 775 (8th Cir. 1995) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).  Nevertheless, without a showing that it will likely prevail on its claim that physicians will be compelled to deliver an ideological message, Planned Parenthood's asserted threat of irreparable harm is correspondingly weakened in comparison to the State's (and the public's) interest in providing pregnant women with all possible relevant information about abortion, thereby "reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed."  *Casey*, 505 U.S. at 882.  If the movant cannot show that it is likely to prevail on the merits, there is no reason at the preliminary injunction stage for the courts to disturb a duly elected legislature's attempt to balance these interests.

IV.

Relying on § 10 of the Act, the district court's order also preliminarily enjoined several other provisions of the Act without analysis and left the prior version of S.D.C.L. § 34-23A-10.1 in effect. The parties have disputed on appeal whether the language of § 10 required such a broad result. Because the preliminary injunction of the additional provisions followed solely from the preliminary injunction of § 7(1)(b) on compelled speech grounds, our vacatur of the preliminary injunction of § 7(1)(b) also vacates the associated preliminary injunction of the other provisions. As a result, resolution of the dispute concerning the effect of § 10 is not necessary to resolve the instant case. On remand, if the district court, in its discretion, finds that any of Planned Parenthood's heretofore unaddressed claims merit a preliminary injunction of any section or subsection of the Act, the parties may, of course, make arguments to the district court about the effect that § 10 should have on the scope of any resulting preliminary injunction.

V.

We conclude that the district court erred in granting a preliminary injunction based on Planned Parenthood's claim that the Act violates physicians' First Amendment rights. Accordingly, we vacate the preliminary injunction and remand to the district court for further proceedings consistent with this opinion.

LOKEN, Chief Judge, concurring.

Having concluded that Planned Parenthood's facial attack on § 7(1)(b) of the Act does not warrant issuance of a preliminary injunction, I join Part II and footnote 7 of the court's opinion and concur in its result.

MURPHY, Circuit Judge, with whom WOLLMAN, BYE and MELLOY, Circuit Judges, join, dissenting.

-23-

I respectfully dissent. In order to uphold an amendment to South Dakota's informed consent law which imposes unprecedented restrictions on women seeking abortions and unprecedented demands on their physicians, the court has bypassed important principles of constitutional law laid down by the Supreme Court. It has also found it necessary to revise the circuit standard for preliminary injunctions and to depart from established practice by not remanding for the district court to have the opportunity to apply the new standard to the constitutional issues raised by Planned Parenthood. Since appellants have not shown that the district court abused its discretion in issuing a preliminary injunction, its order should be affirmed.

## I.

The provisions of this Act go far beyond the informed consent laws which have been upheld by the Supreme Court and the courts of appeal against constitutional challenges.[12] The unique features in the Act include the extent of its interference with the doctor patient relationship, the nature of the information it forces the attending physician to transmit to the woman patient, the requirement that doctors certify that their patient has understood the state's messages, and the provision that any question raised by a woman be attached to her personal and permanent medical record.

A woman's constitutional right to terminate her pregnancy before viability has been consistently upheld by the Supreme Court in the thirty five years since Roe v. Wade, 410 U.S. 113 (1973). See, e.g., City of Akron v. Akron Center for Reprod. Health, Inc., 462 U.S. 416, 420 (1983) (woman has constitutional right to terminate her pregnancy) (overruled on other grounds); Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 846 (1992) (woman has right to an abortion before viability without undue interference from the state); Stenberg v. Carhart, 530

---

[12]For the full text of the Act see the attached Addendum to the Dissenting Opinion, which also illustrates the Act's relationship to the state's prior informed consent law.

U.S. 914, 921 (2000) (Carhart I) (woman has right to choose an abortion before viability); Gonzales v. Carhart, 127 S.Ct. 1610, 1626 (2007) (Carhart II) (state may not prevent "any woman from making the ultimate decision to terminate her pregnancy").

The leading case on the constitutionality of informed consent requirements is the Supreme Court's decision in Casey. The Pennsylvania statute upheld there required that absent a medical emergency, a physician should inform the patient in advance of an abortion about "[t]he nature of the proposed procedure or treatment and of those risks and alternatives to the procedure or treatment that a reasonable patient would consider material to the decision of whether or not to undergo the abortion." Casey, 505 U.S. at 902. Information about the probable gestational age of the fetus and medical risks associated with carrying the child to term were also to be provided, and the woman was to be made aware of her right to access printed materials describing the fetus and listing agencies which offer alternatives to abortion, prenatal and neonatal care, and guidance for obtaining child support. Id. at 902-03. The only certification requirement was that a woman was to acknowledge in writing that the information has been made available to her. Id. at 903. Finding these provisions to be reasonable measures to inform a woman's choice, the Supreme Court held that they did not amount to an undue burden on her constitutional right to have an abortion. Id. at 883.

The two informed consent statutes which have previously come before our court both closely tracked the Casey provisions and were found to be within constitutional boundaries. In Fargo Women's Health Org. v. Schafer, we upheld an informed consent amendment to a North Dakota abortion law and remarked on "the close similarity between the North Dakota statute and the Pennsylvania statute at issue in Casey." 18 F.3d 526, 532 (8th Cir. 1994). The law required that absent a medical emergency, the patient be informed at least 24 hours before the procedure of the name of the physician performing the abortion and of the medical risks of an abortion and

of carrying the pregnancy to term.  Id. at 527.  The patient was also to be told of the probable gestational age of the unborn child, medical assistance benefits, support liability of the father, and the availability of printed materials about fetal development and adoption services.  Id.

In 1993 South Dakota enacted an informed consent law with provisions "substantially similar to [those] upheld by the Supreme Court in Casey," and we upheld it as not imposing an undue burden on a woman's right to an abortion.  Planned Parenthood, Sioux Falls Clinic v. Miller, 63 F.3d 1452, 1467 (8th Cir. 1995).  That law required that the patient knowingly consent to an abortion and be provided with medical facts relevant to the procedure itself, as well as information about abortion alternatives and possible sources of financial and medical assistance.  See id.

Other circuits have also upheld informed consent statutes by reference and comparison to the Pennsylvania law which passed constitutional muster in Casey.  For example, the Seventh Circuit approved such an Indiana law in A Woman's Choice-East Side Women's Clinic v. Newman, 305 F.3d 684, 686 (7th Cir. 2002), and a Wisconsin law in Karlin v. Foust, 188 F.3d 446, 481-82 (7th Cir. 1999).  The Fifth Circuit similarly rejected a facial challenge to a Mississippi informed consent law "substantially identical to similar provisions of the Pennsylvania Act at issue in Casey."  Barnes v. Moore, 970 F.2d 12, 13 (5th Cir. 1992) (per curiam).  In addition many district courts have approved informed consent laws closely tracking the Casey provisions.  See, e.g., Eubanks v. Schmidt, 126 F. Supp. 2d 451, 455 n.5 (W.D. Ky. 2000) ("For purposes relevant to this [constitutional] analysis, the Pennsylvania and Kentucky informed consent statutes are identical."); Utah Women's Clinic, Inc. v. Leavitt, 844 F. Supp. 1482, 1486 (D. Utah 1994) ("The Utah and Pennsylvania laws are nearly identical."), rev'd on other grounds, 75 F.3d 564 (10th Cir. 1995).

These informed consent provisions were consistent with <u>Casey</u> because they reflected the state's legitimate interest in ensuring that women receive accurate and relevant information before exercising their right to an abortion. Such disclosures educate the patient about the factual aspects of an abortion, including the medical procedure and the development of the fetus. They may also include information about available child care assistance and financial liability of the father. <u>See, e.g.</u>, <u>Schafer</u>, 18 F.3d at 527; <u>Miller</u>, 63 F.3d at 1467; <u>Newman</u>, 305 F.3d at 686.

Comparison of the Act with the informed consent laws upheld by the courts shows that the South Dakota provisions are strikingly different from those which have passed constitutional muster. Rather than focusing on medically relevant and factually accurate information designed to assist a woman's free choice, the Act expresses ideological beliefs aimed at making it more difficult for women to choose abortions. Indeed, "[t]he obvious objective of the Act . . . is to use the concept of 'informed consent' to eliminate abortions." Robert Post, <u>Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech</u>, 2007 U. Ill. L. Rev. 939, 941 (2007).[13]

The Act requires that physicians make unique statements to their patients unrelated to the intended medical procedure. Several of the provisions in the Act force physicians to advise their patients on metaphysical matters about which there is no medical consensus, likely violating the First Amendment prohibition against compelled speech and placing an undue burden on the exercise of a woman's constitutional right to abort a nonviable fetus. <u>See</u> Post, <u>supra</u>, at 944 ("Plainly this informed consent statute pushes the constitutional envelope in numerous directions . . .").

---

[13]After the Act was enjoined by the district court, the legislature enacted the "South Dakota Women's Health and Human Life Protection Act" in 2006 (H.B. 1215, 81st Leg. (S.D. 2006)), a statute banning all abortions except those necessary to save the life of the mother; that statute was repealed by popular referendum.

Section 7 requires the attending physician to advise the patient in writing that an abortion "terminate[s] the life of a whole, separate, unique, living human being" with whom she enjoys an existing constitutionally protected relationship, which ends with an abortion. See §§ 7(1)(b)-(d). The physician must also tell the patient that significant risks of an abortion include depression, suicide, and suicidal ideation. See § 7(1)(e)(i)-(ii). The patient must sign each page of the state's required messages, certifying that she understands them. § 7(1) ¶ 1. Any questions she may ask or explanations she may seek, as well as the physician's responses, must be reduced to writing and placed in the patient's permanent medical record. § 7(1) ¶ 1. After physicians have complied with these requirements, they must then certify their satisfaction that the patient has read the materials and that she "understands the information imparted." § 7(1) ¶ 2. These are unique requirements, unlike those contained in other informed consent laws.

Planned Parenthood raised First and Fourteenth Amendment objections to the Act and sought injunctive relief from its enforcement. The district court issued a preliminary injunction based on the First Amendment without reaching the other constitutional issues.

II.

The First Amendment gives individuals the right to speak freely and the right to refrain from speaking without government compulsion. Wooley v. Maynard, 430 U.S. 705, 714 (1977). Like any right under the Constitution, the right to speak or refrain from speaking is not absolute. While doctors have First Amendment rights not to be compelled to speak by the state, those rights may be limited by "reasonable licensing and regulation." Casey, 505 U.S. at 884. In the abortion context such reasonable regulation includes the state's prerogative to assert its "legitimate interests in the health of the woman and in protecting the potential life within her." Id. at 871. For that reason a state may require physicians to provide objectively truthful and

nonmisleading information before obtaining a patient's informed consent to an abortion. See id. at 882. But if "the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." Wooley, 430 U.S. at 717.

The challenged Act compels doctors to declare to their patients that "the abortion will terminate the life of a whole, separate, unique, living human being." § 7(1)(b). The term "human being" lacks a particular scientific definition or medical meaning. See Wolpe Aff. ¶ 4. Even in common parlance the term "human being" is susceptible to multiple meanings. Compare NTC's Compact English Dictionary 220 (2000) ("human being n. a person; a human creature") with 6 The New Encyclopedia Britannica 134 (15th ed. 1998) ("a bipedal primate mammal that is anatomically related to the great apes").[14] In certain situations, especially where used in contradistinction to other species of animal, it may refer to purely biological characteristics. It also may be a value judgment, indicating entitlement to the moral or political rights shared by all persons.

In the context of abortion, the term "human being" has an overwhelmingly subjective, normative meaning, in some sense encompassing the whole philosophical debate about the procedure. See Post, supra, at 956 ("[w]hether the fetus is a 'human being' is [] understood by all sides to the abortion controversy to be an essentially contested moral proposition"). Justice Scalia in his Casey dissent pointed out that the beginning of human life cannot be determined by the state:

> The whole argument of abortion opponents is that what the Court calls
> the fetus and what others call the unborn child *is a human life*. Thus,

[14]Webster's New College Dictionary (3d ed. 2005) defines the noun "human" as a "human being," but fails to provide any definition for the latter term, suggesting that the task of assigning conclusive meaning to the term is ultimately reductive.

> whatever answer <u>Roe</u> came up with after conducting its "balancing" is bound to be wrong, unless it is correct that the human fetus is in some critical sense merely potentially human. There is of course no way to determine that as a legal matter; it is in fact a *value judgment*.

505 U.S. at 982 (second emphasis added). <u>See also</u> <u>Roe</u>, 410 U.S. at 159 (no consensus on beginning of life); <u>Carhart I</u>, 530 U.S. at 980 (Thomas, J., dissenting) ("Abortion . . . ends, *depending on one's view*, human life or potential human life." (emphasis added)). The philosophical or religious question of when a human life comes into existence is distinct from the scientific question of whether a fetus is biologically a member of the species. <u>See</u> <u>Thornburgh v. Am. Coll. of Obstetricians & Gynecologists</u>, 476 U.S. 747, 792 (1986) (White, J., dissenting) ("However one answers the metaphysical or theological question whether a fetus is a 'human being' . . . one must at least recognize . . . that the fetus is an entity that bears in its cells all the genetic information that characterizes a member of the species *homo sapiens . . .*").

The constitutionally significant difference between regulation of verifiable fact as opposed to metaphysical belief – between neutral information and subjective idea – has been well recognized by the Supreme Court. <u>See, e.g.</u>, <u>Casey</u>, 505 U.S. at 884 (state may regulate speech incident to practice of medicine); <u>Whalen v. Roe</u>, 429 U.S. 589 (1977) (state may regulate the writing of prescriptions); <u>Pacific Gas & Elec. Co. v. Public Utilities Com'n of California</u>, 475 U.S. 1, 15 n.12 (1986) (state may not compel a party to disseminate subjective messages contrary to its own views but disclosure of factual and legal information may be mandated); <u>Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio</u>, 471 U.S. 626, 651 (1985) (lawyer advertising requirements did not violate First Amendment because they consisted of purely factual and uncontroversial information).

Notwithstanding a state's prerogative to require certain factual disclosures in the course of professional communications, the state may not "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens

to confess by word or act their faith therein." West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943). The Act crosses that constitutional line by requiring physicians to communicate metaphysical ideas unrelated to any legitimate state interest in regulating the practice of medicine. See City of Akron, 462 U.S. at 472 n.16 (O'Connor, J., dissenting) (informed consent laws may "violate the First Amendment rights of the physician if the state requires him or her to communicate its ideology"); cf. Wooley, 430 U.S. at 720 (Rehnquist, J., dissenting) (no constitutional violation because "[t]he State has not forced appellees to 'say' anything; and it has not forced them to communicate ideas. . ."). Even in areas where a state has authority to regulate, "only a compelling state interest . . . can justify limiting First Amendment freedoms." Williams v. Rhodes, 393 U.S. 23, 31 (1968) (quoting NAACP v. Button, 371 U.S. 415, 438 (1963)). Since the state can assert no legitimate interest in defending the compulsory communication of ideological statements which do not pertain to its regulation of the practice of medicine, these provisions can not withstand constitutional scrutiny. Cf. Wooley, 430 U.S. at 717 (state's legitimate interest in fostering community pride through license plates cannot outweigh First Amendment rights given ideological nature of required message).

Nothing in the Supreme Court's recent decision in Carhart II changes this fundamental principle. Although a state may use its own voice to "show its profound respect" for fetal life, Carhart II, 127 S.Ct. at 1633, nowhere did the Supreme Court authorize a state to commandeer the voice of a physician to disseminate its ideological message. In fact, the Court acknowledged the government's regulatory interest there in light of the prevailing medical view that a particular method of late term abortion was unnecessary because safe alternative methods existed, see id. at 1638, finding the Congressional ban of such a "brutal and inhumane procedure" to be consistent with the government's "legitimate interests in regulating the medical profession." Id. at 1633.

South Dakota's attempted regulation of the medical profession is different because it requires physicians to espouse theological or philosophical beliefs about which there is no medical consensus and which implicate no legitimate governmental regulatory interests. As recently pointed out by a unanimous New Jersey Supreme Court, "there is no consensus in the medical community or society supporting [the] position that a six-to eight-week-old embryo is, as a matter of biological fact - as opposed to a moral, theological, or philosophical judgment - 'a complete, separate, unique and irreplaceable human being.'" Acuna v. Turkish, 192 N.J. 399, 930 A.2d 416, 425 (2007).[15] The New Jersey court recognized the "deep societal and philosophical divide" about "the profound issue of when life begins" and suggested that to compel doctors to convey such philosophical ideas to their patients about which there is no medical consensus could violate their First Amendment rights against compelled speech and place an undue burden on the exercise of a woman's constitutional right to abort a nonviable fetus. Id. at 426-27.

The majority summarily concludes without explanation that "[t]he State's evidence suggests that the biological sense in which the embryo or fetus is whole, separate, unique and living should be clear in context to a physician." Ante at 19. It appears to rely on the testimony of Dr. Peeters-Ney that a unique set of DNA is present upon conception and *her belief* that the fetus is "whole" because it has the genetic information necessary to mature, and that it is "separate" for the same reason.[16]

---

[15]Acuna was a medical malpractice action in which the same attorney who now represents the intervenors here unsuccessfully advocated for a common law rule requiring physicians to make strikingly similar statements to their patients as those mandated by the Act.

[16]A similar proposition was advanced by the respondent in Roe, who argued that a fetus must be a human being because it has the biological characteristics of the human species. That proposition was rejected by the Supreme Court and not reflected in its constitutional findings. See Brief of Respondent-Appellee at 30, Roe v. Wade, 410 U.S. 113 (1973) (No. 70-18), 1971 WL 126683.

See Peeters-Ney Aff. ¶ 3. The medical fact that a unique set of DNA is present at conception, however, does not support a conclusion that the statutory adjectives preceding the word "human being" have scientific meaning. Dr. Ball testified to the contrary. She explained that the proposition that an abortion terminates the life of a "whole, separate, unique, living human being" is neither a medical statement nor a fact which medical doctors are trained to address, but rather an "ideological pronouncement." Ball Aff. ¶ 4. Dr. Wolpe similarly refuted assertions by several of the state's other declarants who claimed that it is a medical or scientific fact that an embryo or fetus is a "whole, separate, unique, living human being" from the moment of conception. Wolpe Aff. ¶ 2. The record is far from showing a medical consensus that a full set of DNA constitutes a "whole, separate, unique, living human being."

The adjectives used in the Act to modify "human being" are not statutorily defined so they must be construed "according to [their] accepted usage and a strained, unpractical, or absurd result should be avoided." Juttelstad v. Juttelstad, 587 N.W.2d 447, 450 (S.D. 1998). A nonviable fetus is not "whole" in that it cannot maintain a separate life outside the woman's womb, and it neither "contain[s] all components or constituents" nor does it represent "a complete entity or system." See, e.g., Webster's New College Dictionary (3d ed. 2005). Likewise, "separate" in common usage means "detached," "disconnected," "existing independently," or "not shared." See, e.g., Random House Unabridged Dictionary (2006). A fetus cannot be established to be a "separate" human being since it is physically attached to a woman by an umbilical cord and fully contained inside her body, a connection on which its very survival depends. Cf. Wolpe Aff. ¶ 6.

Although a legislature may choose to give words its own unique definition, it cannot establish by fiat that the term "human being" has only biological connotations, for the constitutional analysis of whether the mandated statements convey factual truths or contestable ideology is not controlled by the wording of the Act. See Legal Servs. Corp. v. Velazquez, 531 U.S. 533, 548 (2001) (special vigilance required when legislature attempts to "insulate its own laws from legitimate judicial challenge"). It

-33-

is the role of the judiciary, rather than the legislature, to determine whether speech and speech regulations implicate the First Amendment. See Pennekamp v. Florida, 328 U.S. 331, 335 (1946).

To understand the constitutional issues before the court, it is important to look exactly at the words employed in § 7, for "[t]he preeminent canon of statutory interpretation requires us to presume that [the] legislature says in a statute what it means and means in a statute what it says there." BedRoc Ltd., LLC v. United States, 541 U.S. 176, 183 (2004). While the majority contends that the attending physician would attach the Act's definition of "human being" to the required information to be transmitted, nothing in the statute instructs a physician to do that. Section 7(1) enumerates what the physician must tell the patient, and it contains no cross reference to the § 8 definition.[17] There is no evidence in the record showing that a physician would go beyond the mandatory advisories in § 7 unless directed by the statute to do so, especially in light of the strict certification requirements and criminal penalties. See S.D.C.L. § 34-23A-10.2.

The majority acknowledges that when § 7(1)(b) is taken in isolation, it "certainly may be read to make a point in the debate about the ethics of abortion." Ante at 8. In the attempt to uphold the statute, it turns to the statutory definition of "human being" in § 8(4), which it initially quotes in its entirety, ante at 4, but then excises in part as it seeks to employ § 8(4) to circumvent the ideological nature of the Act's use of the term. Ante at 19. Section 8(4) defines "human being" as "an

---

[17]South Dakota cites Wash. State Grange v. Wash. State Republican Party, 128 S. Ct. 1184 (2008), for the proposition that statutes must be taken as written. Here, it is the majority which speculates that doctors would reach beyond the statute's mandate to add a portion of § 8(4)'s definition to the advisories. While the state's cited case points with disfavor to some facial challenges to statutes, that rule does not apply to abortion legislation. See, e.g., Richmond Medical Center v. Herring, --- F.3d --- , 2008 WL 2102477 at *16 (4th Cir. 2008) ("Carhart II does not question the established validity of facial challenges to abortion statutes"), citing Sabri v. United States, 541 U.S. 600, 609-610 (2004); Carhart I, 530 U.S. at 938-46; Casey, 505 U.S. at 895.

individual living member of the species Homo sapiens, *including the unborn human being* during the entire embryonic and fetal ages *from fertilization to full gestation*." (emphasis added to portions eliminated from the majority's discussion). Without acknowledging the elimination of the italicized portions of the definition, the majority asserts that the "truthfulness and relevance of the disclosure in § 7(1)(b) generates little dispute" once the statutory definition is taken into account. Ante at 18. This pronouncement is quite amazing in light of the well established precept that the point at which human life begins is indeterminable as a legal matter. See, e.g., Roe, 410 U.S. at 159; Acuna, 930 A.2d at 427 (noting the "deep societal and philosophical divide" on the issue).

The Act more than likely violates the First Amendment by compelling doctors to communicate the state's ideology since the statutory definition of "human being" incorporates the metaphysical viewpoint that a "human being" is "living . . . from fertilization." Statutes requiring doctors to tell their patients that a human being exists at conception conflict with the Supreme Court's admonition that a state may not adopt one theory of the beginning of life. City of Akron, 462 U.S. at 444; see also Roe, 410 U.S. at 159 ("We need not resolve the difficult question of when life begins. When those trained in the respective disciplines of medicine, philosophy, and theology are unable to arrive at any consensus, the judiciary, at this point in the development of man's knowledge, is not in a position to speculate as to the answer."). The majority's attempt to save the statute by speculating that doctors will incorporate the definition in § 8(4) into the required script they must deliver cannot succeed since that definition is also constitutionally flawed.

The script physicians are compelled to give by § 7(1)(b) – "that the abortion will terminate the life of a whole, separate, unique, living human being" – incorporates a value judgment and therefore escapes scientific verification. Because the point at which a living human being comes into existence can no more be established in the law or in science than the proposition that a fetus has no soul or that abortion is not a sin, the majority places an unprecedented and impossible burden of proof on

Planned Parenthood by requiring it to show that the state's forced message is "untruthful, misleading or not relevant to the patient's decision to have an abortion." Ante at 17. In contrast, Casey effectively placed the burden of proof on the state by declaring that "[i]f the information . . . is truthful and not misleading, the requirement may be permissible." 505 U.S. at 882. The burden of proof assigned by the majority presupposes that all speech is demonstrably either true or false, overlooking the vast expanse of ideas that lie beyond means of proof because they appeal to subjective notions of morality, religion, or aesthetics. See Gertz v. Welch, 418 U.S. 323, 339 (1974) ("Under the First Amendment there is no such thing as a false idea"); Aviation Charter, Inc. v. Aviation Research Group/US, 416 F.3d 864, 870–71 (8th Cir. 2005) (recognizing that not all statements are susceptible of being proven true or false).

The Act effectively restricts the ability of doctors to distance themselves from the mandates of § 7(1) by requiring them to certify that their patient "understands the information imparted," a provision with no parallel in the informed consent provisions which have survived constitutional challenge. See, e.g., 18 Pa. C.S.A. § 3205; S.D.C.L. § 34-23A-1.7 (prior version); Ind. Code § 16-34-2-1.1; Utah Code Ann. § 76-7-305; Wis. Stat. § 253.10; N.D. Cent. Code § 14-02.1-02(5); Ky. Rev. Stat. § 311.725. A law that charges physicians with ensuring that the state's metaphysical concepts are conveyed so that a patient understands them does not provide a realistic opportunity for the expression of alternate views, even if those alternate views were to represent the consensus in the medical community. Physicians may reasonably fear that they would be unable to certify that their patient understands the message if they tried to dissociate themselves from the required advisories or expressed competing views. This compelled speech is quite different from the type of medical information the state may require physicians to convey as part of its reasonable regulation of the medical profession. See Casey, 505 U.S. at 884.

Even if the physician were able to disclaim sponsorship of the state's message, the constitutional defects inherent in compelled ideological speech would not be cured. See Pacific Gas, 475 U.S. at 9 (compulsory transmission of another's speech

-36-

"penalizes the expression of particular points of view and forces speakers to alter their speech to conform with an agenda they do not set"); see also Wooley, 430 U.S. at 717 n.15 (legislation requiring license plate display of state motto unconstitutionally compelled speech because display affirms view expressed in motto, notwithstanding opportunity to disavow state's message through bumper stickers). Views articulated by a doctor in the course of face to face contact with a patient – a context in which patients expect doctors to use their best and honest judgment – are, if anything, more likely to be attributed to the speaker than the well known slogan affixed to a state issued license plate in Wooley or the forced publication of third party speech in Pacific Gas. Moreover, the certification requirement for women seeking abortions and the mandate that any questions or comments on their part be entered into their permanent medical record are mechanisms likely to compel a woman to conform her speech to the state's chosen messages. The Act thus likely violates the First Amendment rights of both physician and patient.

### III.

The injunction issued by the district court should not be reversed without considering the other grounds for relief advanced by Planned Parenthood. It is well established that an appellate court can affirm a lower court on the basis of alternate grounds. See Transcontinental Ins. Co. v. W.G. Samuels Co., Inc., 370 F.3d 755, 758 (8th Cir. 2004). Planned Parenthood also alleged that the Act violates the Fourteenth Amendment by creating an undue burden on a woman's constitutional right to terminate her pregnancy and by being unconstitutionally vague.

The Supreme Court has made clear that the state may not place an undue burden on a woman's decision to have an abortion before viability. See Casey, 505 U.S. at 874. Informed consent requirements prior to an abortion may be permissible only if they mandate the disclosure of "truthful and not misleading" information. Id. at 882. The state may express in myriad ways its "respect for life, including life of the unborn," Carhart II, 127 S.Ct. at 1633, provided that its requirements "inform the woman's free choice, not hinder it." Casey, 505 U.S. at 877. Procedures that "amount

-37-

in practical terms to a substantial obstacle to a woman seeking an abortion" are an undue burden and therefore constitutionally prohibited.  Id. at 884 (striking down spousal consent requirement because it would deter abortions "as surely as if the Commonwealth had outlawed abortions," id. at 894).

The provisions mandated by §§ 7(1)(b)-(d) far exceed those at issue in Casey and the other statutes which have been upheld since then.  Not only do the mandatory advisories raise concerns of compelled speech in violation of the First Amendment as already discussed, but they also more than likely impose an undue burden on a woman's decision to have an abortion before viability.  That is because their apparent intent and probable effect is to place substantial obstacles in the way of a woman attempting to exercise her constitutional right to obtain an abortion.  Under § 7(1), a woman seeking an abortion must sign "each page of the written disclosure *with the certification that she has read and understands all of the disclosures . . .*") (emphasis added).  By way of comparison, the informed consent provisions upheld by the Supreme Court and lower courts mandate only that a woman certify that required information has been made available to her.  See Casey, 505 U.S. at 902; see also Newman, 305 F.3d at 686; Karlin, 188 F.3d at 455; Miller, 63 F.3d at 1467; Schafer, 18 F.3d at 527; Eubanks, 126 F. Supp. 2d at 461-62.

The state's argument that it has required the disclosure of only factual information relevant to a woman's decisionmaking is unconvincing.  No court has upheld an assertion like the one in § 7(1)(b) that a fetus is a "whole, separate, unique, living human being."  No court has validated the definition in § 8(4) that a "human being" is "living . . . from fertilization."  On the contrary, courts have consistently recognized that a state may not regulate abortions based on its view of when human life commences.  That a "physician [] inform his patient that 'the unborn child is a human life from the moment of conception' [was] a requirement inconsistent with the Court's holding in Roe v. Wade that a State may not adopt one theory of when life

begins to justify its regulation of abortions." <u>City of Akron</u>, 462 U.S. at 444;[18] <u>see also</u> <u>Casey</u>, 505 U.S. at 851 ("At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life.").

Under the Act a woman is given a Hobson's choice: either to certify that she understands vague and ideological statements disguised as medical information or to carry her pregnancy to term. But "[a] Hobson's choice, of this sort, is no choice at all." <u>Planned Parenthood of Idaho, Inc. v. Wasden</u>, 376 F. Supp. 2d 1012, 1018 (D. Idaho 2005) (reporting requirement for underage patients an undue burden on right to abortion). The Act's procedural mandates thus likely place an undue burden on a woman's ability to exercise her constitutional right to terminate her pregnancy.

The requirement in § 7(1) ¶ 2 that any question a woman asks, as well as the doctor's response, must be recorded in writing and included in her own permanent medical record likely intrudes upon "the special relationship between patient and physician [. . .] within the domain of private life protected by the Due Process Clause." <u>Cruzan by Cruzan v. Director, Missouri Dept. of Health</u>, 497 U.S. 261, 340 n.12 (1990). The Act provides no protections to ensure that this interchange or the woman's medical records will be kept confidential and not be released to other individuals.[19] The state has asserted no valid regulatory interest in this requirement affecting the patient's permanent medical record. <u>Cf.</u> <u>Carhart II</u>, 127 S.Ct. at 1633 (state could further its legitimate interests in regulating medical profession so long as it did not impose an undue burden). Conditioning a woman's right to obtain an abortion on her willingness to give up her private relationship with her doctor likely

---

[18]Although significant portions of <u>City of Akron</u> have been overruled, its prohibition of conveying ideological information in the guise of informed consent laws remains valid. <u>See</u> <u>Casey</u>, 505 U.S. at 882.

[19]In contrast, Massachusetts' informed consent law requires that all consent forms, transcripts of evidence, and written findings "shall be confidential and may not be released to any person except by the pregnant woman's written informed consent or by a proper judicial order, other than to the pregnant woman herself, her doctor, or any person whose consent is required." M.G.L.A. 112 § 12S.

creates an undue burden on the woman's constitutional rights by deterring her from having an abortion. See Thornburgh, 476 U.S. at 759 ("The States are not free, under the guise of protecting maternal health or potential life, to intimidate women into continuing pregnancies.").

Some of the advisories required by the Act are likely void for vagueness in violation of the due process clause, partly because they do not make clear exactly what is essential to obtain the patient's informed consent. In Carhart II, the Supreme Court explained that statutory requirements have to be sufficiently definite so that the ordinary doctor and patient "can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." 127 S.Ct. at 1628. In contrast to the federal law at issue in Carhart II, which was specific in prohibiting the knowing partial delivery of an intact fetus by using surgical tools to destroy its skull, the Act does not make clear what conduct may subject a physician to criminal prosecution. It nevertheless warns that physicians who act knowingly or in reckless disregard of the statutory requirements are guilty of a Class 2 misdemeanor. See S.D.C.L. 34-23A-10.2.

The Act requires that a physician tell the patient that she "has an existing relationship with th[e] unborn human being and that the relationship enjoys protection under the United States Constitution and under the laws of South Dakota." § 7(1)(c). "[B]y having an abortion, her existing relationship and her existing constitutional rights with regards to that relationship will be terminated." § 7(1)(d). Entirely omitted from the advisories ordered by the state is the authoritative information that the patient has a constitutional right to choose to have an abortion. See, e.g., Casey, 505 U.S. at 846. The Act's reference to a constitutional relationship between the woman and her unborn child is unclear and undefined. If a woman were to ask her doctor what precisely is meant by her "existing constitutional rights with regards to that relationship," § 7(1)(d), and the doctor declined to answer her question on the grounds of being unqualified to discuss such vague legal concepts, the doctor could be subject to prosecution after performing an abortion. In her affidavit Dr. Ball stated that she would not be able to clarify the concepts the Act requires be communicated

-40-

"because these are not medical statements or facts that I am trained as a Medical Doctor to address." Ball Aff. ¶ 4. How then would a physician be able to certify that the patient understands the required advisories and proceed to perform an abortion? The Act thus likely amounts to a substantial obstacle for a woman seeking to exercise her right to terminate her pregnancy.

Equally problematic from a vagueness standpoint is the requirement in § 7(1)(e) that the physician provide a written description of "all known medical risks of the procedure and the statistically significant risk factors to which the pregnant woman would be subjected," including "[d]epression and related psychological distress" and an "[i]ncreased risk of suicide ideation and suicide." §§ 7(1)(e)(i), (ii). The statute does not define or provide guidance to physicians about what constitutes a statistically significant risk factor. Dr. Ball stated that "[c]orrelations can be strong or weak, so a statistically-significant risk can be an immaterial or remote risk. . . Without additional guidance, I do not know how to determine whether something is statistically significant as set forth in the Statute, so I do not know how to ensure that I comply with the Statute." Ball Aff. ¶ 7. Provisions such as these which fail to give a "person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute" have been found void for vagueness, especially "where the uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights." Colautti v. Franklin, 439 U.S. 379, 390-91 (1979). A physician unsure of knowing how to comply with the Act might reasonably be expected to refuse to perform an abortion for fear of criminal liability.

Although legislative factfinding is reviewed under a deferential standard, courts retain "an independent constitutional duty to review factual findings where constitutional rights are at stake." Carhart II, 127 S.Ct. at 1637. The legislative determinations with respect to the state's view that abortion results in significantly increased risks of depression or even suicide are highly questionable in light of medical studies in the United States and abroad which have refuted the theory that women undergoing abortions suffer from long term emotional harm or are more at risk

-41-

than women who carry their pregnancy to term. A learned commentator has pointed out that the § 7(1)(e) provisions "very likely . . . require physicians to disclose *information that is false*." See Post, supra, at 961 (emphasis added); see also Carhart II, 127 S.Ct. at 1649 n.7 (Ginsburg, J., dissenting) (citing numerous peer reviewed studies suggesting that no evidence of postabortion syndrome and related depression exists). As a 2006 Congressional report on the subject pointed out, "there is considerable scientific consensus that having an abortion rarely causes significant psychological harm." United States House of Representatives, Minority Staff, Special Investigations Div., Comm. on Gov't Reform, False and Misleading Health Information Provided by Federally Funded Pregnancy Resource Centers at 11 (2006).

The Act's broad mandate about psychological distress and suicide ideation is unlike the requirements in other informed consent laws found to be constitutional, which entrusted the communication of particular medical risks to the doctor's best professional judgment. See, e.g., S.D.C.L. § 34-23A-10.1(1)(b) (prior version) ("The particular medical risks associated with the particular abortion procedure to be employed including, *when medically accurate*, the risks of infection, hemorrhage, danger to subsequent pregnancies, and infertility.") (emphasis added); N.D. Cent. Code § 14-02.1-02(5)(a)(2) (same). By not allowing a doctor to omit the required disclosures in order to prevent serious adverse effects on a patient's health (in exceptional circumstances other than an emergency), the Act undercuts a physician's best medical judgment and discretion. Rejecting an argument in Casey that the Pennsylvania informed consent law violated the constitutional right to privacy between the pregnant woman and her physician, the Supreme Court referred to the law's provision allowing doctors to exercise their best medical judgment by permitting them not to furnish the required advisories if they could demonstrate by a preponderance of the evidence that they reasonably believed that making the disclosures would result in a severely adverse effect on the health of the patient. See 505 U.S. at 883-84. No comparable provision exists in the Act.

IV.

In the process of reversing the district court, the majority apparently found it necessary to revise the circuit standard for preliminary injunctions established by our en banc court in Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109 (8th Cir. 1981) (en banc), twenty seven years ago, creating a special test for enjoining legislative enactments. Although Dataphase required the movant to show probable success on the merits, it retained flexibility by allowing the district court to weigh several factors. See 640 F.2d at 114. Here, however, the district court used a lower standard – framing the question as whether Planned Parenthood had shown a fair chance of success on the merits – citing Heartland Acad. Cmty. Church v. Waddle, 335 F.3d 684, 690 (8th Cir. 2003). Since Planned Parenthood is more than likely to prevail on the merits under either the court's new standard or the traditional Dataphase test, the district court did not abuse its discretion in granting preliminary injunctive relief.

By requiring in challenges to duly enacted statutes that "district courts make a threshold finding on the element that a party is likely to prevail on the merits," ante at 13-14, the majority departs from the balancing approach articulated by Dataphase and its progeny. See, e.g., Lankford v. Sherman, 451 F.3d 496, 503 (8th Cir. 2006) ("No single factor is dispositive, as the district court must balance all factors to determine whether the injunction should issue."); United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1179 (8th Cir. 1998) (same); Calvin Klein Cosmetics Corp. v. Lenox Lab., Inc., 815 F.2d 500, 503 (8th Cir. 1987) (same); see also 11A Wright, Miller & Kane, Federal Practice and Procedure § 2948.3 (2d ed. 1995) (when considering a request for a preliminary injunction "the degree of likelihood of success is not determinative. Rather it must be considered and balanced with the comparative injuries of the parties.").

The majority's elevation of likelihood of success to a threshold requirement in cases challenging the constitutionality of a statute is not in keeping with Supreme Court precedent. In affirming a preliminary injunction against the enforcement of the

-43-

Child Online Protection Act, for example, the Court never suggested that courts use a special standard or place weighted emphasis on the likelihood of success when a plaintiff seeks to enjoin a state or federal statute.  See Ashcroft v. ACLU, 542 U.S. 656, 666 (2004).  Rather, the Court emphasized that a district court must consider the risk of irreparable harm along with the likelihood of success when deciding whether to grant a preliminary injunction.  Id.

In Dataphase we observed that a fixed "wooden" test for likelihood of success on the merits is inappropriate since that factor can have little meaning in isolation. 640 F.2d at 113.  While it is well established that "an injunction cannot issue if there is no chance of success on the merits and must be dissolved if the district court's findings of fact do not support the conclusion that there is a threat of irreparable harm," Mid-America Real Estate Co v. Iowa Realty Co., 406 F.3d 969, 972 (8th Cir. 2005) (citations omitted), a plaintiff's probability of success need not be as great when other factors, such as the likelihood it will suffer irreparable harm or the balance of hardships tip decidedly in its favor.  See, e.g., Smyth ex rel. Smyth v. Rivero, 282 F.3d 268, 276-77 (4th Cir. 2002); Ayres v. City of Chicago, 125 F.3d 1010, 1013 (7th Cir. 1997); Six Clinics Holding Corp. v. Cafcomp Sys., Inc., 119 F.3d 393, 399-400 (6th Cir. 1997); Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ. & Welfare, 601 F.2d 199, 203 n.2 (5th Cir. 1979).

A singular focus on likelihood of success to the exclusion of the remaining Dataphase factors is also impractical, because an abbreviated inquiry emphasizing only one factor makes review of the denial of an injunction less efficient and reliable. See Lankford, 451 F.3d at 513 ("The district court is in the best position to evaluate all of the evidence and weigh the factors to determine whether the injunction should issue."); Blue Moon Entm't, LLC v. City of Bates City, Missouri, 441 F.3d 561, 566 (8th Cir. 2006) (vacating and remanding district court's order denying preliminary injunction where district court only analyzed irreparable harm and failed to consider other Dataphase factors); Kai v. Ross, 336 F.3d 650, 653-56 (8th Cir. 2003) (reversing denial of preliminary injunction based primarily on small likelihood of success but "discuss[ing] the other three factors, as was proper").

-44-

The court suggests that deference to democratic processes justifies a higher likelihood standard. All federal and state legislation will thus be reviewed under the same deferential threshold standard, whether or not it is attacked for unconstitutional provisions, whether the legislation involves abortion laws, securities or insurance regulation, environmental statutes, health and welfare laws, or zoning restrictions. The traditional multifactor analysis is well suited for use in deciding these challenges, however, whether the laws in question impact the rights of individuals or of corporations, and where prevention of irreparable harm may be the most significant factor.

The pitfalls of the court's new and curtailed approach for legislative enactments are particularly apparent in this case because the Act more than likely violates constitutionally recognized fundamental rights of women seeking an abortion and of the attending physicians. Laws which infringe on fundamental rights come with a presumption of unconstitutionality, and the government bears the burden of showing otherwise. See, e.g., City of Mobile v. Borden, 446 U.S. 55, 76 (1980) ("[A] law that impinges upon a fundamental right explicitly or implicitly secured by the Constitution is presumptively unconstitutional."). To give the legislature unwarranted deference is to avoid the responsibility for careful scrutiny required by established law. See Ashcroft, 542 U.S. at 664-65 ("If the underlying constitutional question is close . . . we should uphold the injunction and remand for trial on the merits.").

If it were ultimately recognized by a higher court that the Act violates the constitutional rights of doctors or women seeking abortions, irreparable harm will have been suffered each time the unconstitutional advisories have been given and have been certified as understood by the doctor and patient. See Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Similarly, the balance of hardships tips so decidedly in favor of the interests of Planned Parenthood and Dr. Ball that review of the preliminary injunction order is incomplete without analysis of the relative impact of the law, particularly in light of the obstacles in the path of a woman's constitutional right to an abortion. The legislature specifically provided for

the event that the Act were to be found unconstitutional. Since the informed consent law enacted by South Dakota in 1993 would continue to be in effect during any injunction by virtue of §§ 10 and 11 of the Act, the district court's injunction would not have harmed the state's interest in giving women accurate medical information about abortions and available services. Whether the grant of a preliminary injunction furthers the public interest in such a case is largely dependent on the likelihood of success on the merits because the protection of constitutional rights is always in the public interest. See Phelps-Roper v. Nixon, 509 F.3d 480, 485 (8th Cir. 2007).

When the court sees fit to announce a new standard, it should adhere to its usual practice and remand the case so that the district court can apply the new test in the first instance. See Dataphase, 640 F.2d at 114 (vacating injunction without prejudice and remanding to district court); cf. 11A Wright & Miller, Federal Practice and Procedure: Civil § 2962, at 448 ("In general, when the appellate court determines that the trial court's order denying injunctive relief was erroneous, it will reverse and remand the case for further proceedings below."). The Second Circuit, on which the majority relies so heavily in formulating its injunction standard, also follows such a procedure. See Able v. United States, 44 F.3d 128, 132 (2d Cir. 1995) ("Rather than applying the 'likelihood of success' standard ourselves, however, we believe that the wiser course is to allow the district court to make the determination in the first instance.").

A remand is especially appropriate here, as this case has evolved since the intervenors became parties after issuance of the preliminary injunction. The district court has not had the opportunity to consider the relevance and significance of additional evidence. Two crisis pregnancy centers and two counselors have filed numerous declarations describing their counseling services to pregnant women. Cf. id.; Blue Moon Entm't, 441 F.3d at 566 (remanding to develop evidentiary record); Lankford, 451 F.3d at 513 (vacating and remanding district court's order which did not make findings on all four Dataphase factors).

Moreover, the court does not explain why it is better positioned than the district court to apply the new injunction standard to the First Amendment issues, but not to

the other constitutional challenges raised by Planned Parenthood. It is well settled that we are free to affirm on any ground supported by the record, see, e.g., Skare v. Extendicare Health Serv., Inc., 515 F.3d 836, 840 (8th Cir. 2008), and the record supports the district court's injunction.

Finally, it is perplexing that the court chooses to create what it describes as a heightened standard for obtaining injunctive relief in a case in which a statute is challenged for violating well established constitutional rights. Nevertheless, I submit that a careful analysis of this record under either Dataphase or the court's new standard should lead to affirmance.

V.

South Dakota's amended statute dramatically differs in multiple respects from the informed consent abortion laws approved by the Supreme Court and the courts of appeal since Casey. The language of the advisories required by the Act does not consist of factually accurate medical information aimed at assisting the patient to make a knowledgeable choice about whether to undergo an abortion. Instead, the requirements reflect the state's ideological beliefs about the beginning of human life and impose those subjective value judgments on attending physicians and their patients in violation of the United States Constitution. Although the court unnecessarily departs from well established precedent to modify the governing standard for evaluating preliminary injunctions, the injunction order of the district court should be affirmed under either the traditional Dataphase test or the court's new standard because the record shows that Planned Parenthood will more than likely prevail on the merits (and suffer irreparable harm) unless the new statute is enjoined. For all these reasons I respectfully dissent.

## ADDENDUM TO THE DISSENTING OPINION[20]

FOR AN ACT ENTITLED, An Act to establish certain legislative findings pertaining to the health and rights of women, to revise the physician disclosure requirements to be made to a woman contemplating submitting to an abortion, and to provide for certain causes of action for professional negligence if an abortion is performed without informed consent.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF SOUTH DAKOTA:

Section 1. The Legislature finds that all abortions, whether surgically or chemically induced, terminate the life of a whole, separate, unique, living human being.

Section 2. The Legislature finds that there is an existing relationship between a pregnant woman and her unborn child during the entire period of gestation.

Section 3. The Legislature finds that procedures terminating the life of an unborn child impose risks to the life and health of the pregnant woman. The Legislature further finds that a woman seeking to terminate the life of her unborn child may be subject to pressures which can cause an emotional crisis, undue reliance on the advice of others, clouded judgment, and a willingness to violate conscience to avoid those pressures. The Legislature therefore finds that great care should be taken to provide

---

[20]The addendum consists of the complete text of the Act passed by the South Dakota legislature in 2005 (H.B. 1166) with the state's format showing the portions of the 1993 Act that were stricken and underlining the provisions added by the amendment.

a woman seeking to terminate the life of her unborn child and her own constitutionally protected interest in her relationship with her child with complete and accurate information and adequate time to understand and consider that information in order to make a fully informed and voluntary consent to the termination of either or both.

Section 4. The Legislature finds that pregnant women contemplating the termination of their right to their relationship with their unborn children, including women contemplating such termination by an abortion procedure, are faced with making a profound decision most often under stress and pressures from circumstances and from other persons, and that there exists a need for special protection of the rights of such pregnant women, and that the State of South Dakota has a compelling interest in providing such protection.

Section 5. The Legislature finds that, through the common law, the courts of the State of South Dakota have imposed a standard of practice in the health care profession that, except in exceptional circumstances, requires physicians and other health care practitioners to provide patients with such facts about the nature of any proposed course of treatment, the risks of the proposed course of treatment, the alternatives to the proposed course, including any risks that would be applicable to any alternatives, as a reasonable patient would consider significant to the decision of whether to undergo the proposed course of treatment.

Section 6. That chapter 34-23A be amended by adding thereto a NEW SECTION to read as follows:

The South Dakota common law cause of action for medical malpractice informed consent claims based upon the reasonable patient standard is reaffirmed and is hereby expressly declared to apply to all abortion procedures. The duty of a physician to disclose all facts about the nature of the procedure, the risks of the procedure, and the alternatives to the procedure that a reasonable patient would consider significant to her

decision of whether to undergo or forego the procedure applies to all abortions. Nothing in this Act may be construed to render any of the requirements otherwise imposed by common law inapplicable to abortion procedures or diminish the nature or the extent of those requirements. The disclosure requirements expressly set forth in this Act are an express clarification of, and are in addition to, those common law disclosure requirements.

Section 7. That § 34-23A-10.1 be amended to read as follows:

34-23A-10.1. No abortion may be performed except with the voluntary and informed consent of the female upon whom the abortion is to be performed. Except in the case of a medical emergency, consent to an abortion is voluntary and informed only if:

(1) The female is told the following by the physician who is to perform the abortion or by the referring physician, at least twenty-four hours before the abortion:

(a) The name of the physician who will perform the abortion;

(b) The particular medical risks associated with the particular abortion procedure to be employed including, when medically accurate, the risks of infection, hemorrhage, danger to subsequent pregnancies, and infertility;

(c) The probable gestational age of the unborn child at the time the abortion is to be performed; and

(d) The medical risks associated with carrying her child to term;

(2) The female is informed, by telephone or in person, by the physician who is to perform the abortion, by the referring physician, or by an agent of either, at least twenty-four hours before the abortion:

(a) That medical assistance benefits may be available for prenatal care, childbirth, and neonatal care;

(b) That the father is liable to assist in the support of her child, even in instances in which the father has offered to pay for the abortion; and

(c) That she has the right to review the printed materials described in § 34-23A-10.3 and the website described in § 34-23A-10.4. The physician or the physician's agent shall orally inform the female that the materials have been provided by the State of South Dakota at no charge to the female. If the female chooses to view the materials, they shall either be given to her at least twenty-four hours before the abortion or mailed to her at least seventy-two hours before the abortion by certified mail, restricted delivery to addressee, which means the postal employee can only deliver the mail to the addressee;

(3) The female certifies in writing, prior to the abortion, that the information described in subdivisions (1) and (2) of this section has been furnished her, and that she has been informed of her opportunity to review the information described in § 34-23A-10.3; and

(4) Prior to the performance of the abortion, the physician who is to perform the abortion or the physician's agent receives a copy of the written certification prescribed by subdivision (3).

The physician may provide the information prescribed in subdivision (1) by telephone without conducting a physical examination or tests of the patient, in which case the information required to be supplied may be based on facts supplied the physician by the female and whatever other relevant information is reasonably available to the physician.

No abortion may be performed unless the physician first obtains a voluntary and informed written consent of the pregnant woman upon whom the physician intends

to perform the abortion, unless the physician determines that obtaining an informed consent is impossible due to a medical emergency and further determines that delaying in performing the procedure until an informed consent can be obtained from the pregnant woman or her next of kin in accordance with chapter 34-12C is impossible due to the medical emergency, which determinations shall then be documented in the medical records of the patient. A consent to an abortion is not voluntary and informed, unless, in addition to any other information that must be disclosed under the common law doctrine, the physician provides that pregnant woman with the following information:

(1) A statement in writing providing the following information:

(a) The name of the physician who will perform the abortion;

(b) That the abortion will terminate the life of a whole, separate, unique, living human being;

(c) That the pregnant woman has an existing relationship with that unborn human being and that the relationship enjoys protection under the United States Constitution and under the laws of South Dakota;

(d) That by having an abortion, her existing relationship and her existing constitutional rights with regards to that relationship will be terminated;

(e) A description of all known medical risks of the procedure and statistically significant risk factors to which the pregnant woman would be subjected, including:

(i) Depression and related psychological distress;

(ii) Increased risk of suicide ideation and suicide;

(iii) A statement setting forth an accurate rate of deaths due to abortions, including all deaths in which the abortion procedure

-52-

was a substantial contributing factor;

(iv) All other known medical risks to the physical health of the woman, including the risk of infection, hemorrhage, danger to subsequent pregnancies, and infertility;

(f) The probable gestational age of the unborn child at the time the abortion is to be performed, and a scientifically accurate statement describing the development of the unborn child at that age; and

(g) The statistically significant medical risks associated with carrying her child to term compared to undergoing an induced abortion.

The disclosures set forth above shall be provided to the pregnant woman in writing and in person no later than two hours before the procedure is to be performed. The physician shall ensure that the pregnant woman signs each page of the written disclosure with the certification that she has read and understands all of the disclosures, prior to the patient signing a consent for the procedure. If the pregnant woman asks for a clarification or explanation of any particular disclosure, or asks any other question about a matter of significance to her, the explanation or answer shall be made in writing and be given to the pregnant woman before signing a consent for the procedure and shall be made part of the permanent medical record of the patient;

(2) A statement by telephone or in person, by the physician who is to perform the abortion, or by the referring physician, or by an agent of both, at least twenty-four hours before the abortion, providing the following information:

(a) That medical assistance benefits may be available for prenatal care, childbirth, and neonatal care;

(b) That the father of the unborn child is legally responsible to provide financial support for her child following birth, and that this legal

obligation of the father exists in all instances, even in instances in which the father has offered to pay for the abortion;

(c) The name, address, and telephone number of a pregnancy help center in reasonable proximity of the abortion facility where the abortion will be performed; and

(d) That she has a right to review all of the material and information described in this Act, as well as the printed materials described in § 34-23A-10.3, and the website described in § 34-23A-10.4. The physician or the physician's agent shall inform the pregnant woman, orally or in writing, that the materials have been provided by the State of South Dakota at no charge to the pregnant woman. If the pregnant woman indicates, at any time, that she wants to review any of the materials described, such disclosures shall be either given to her at least twenty-four hours before the abortion or mailed to her at least seventy-two hours before the abortion by certified mail, restricted delivery to addressee, which means the postal employee can only deliver the mail to the addressee;

Prior to the pregnant woman signing a consent to the abortion, she shall sign a written statement that indicates that the requirements of this section have been complied with. Prior to the performance of the abortion, the physician who is to perform the abortion shall receive a copy of the written disclosure documents required by this section, and shall certify in writing that all of the information described in those subdivisions has been provided to the pregnant woman, that the physician is, to the best of his or her ability, satisfied that the pregnant woman has read the materials which are required to be disclosed, and that the physician believes she understands the information imparted.

Section 8. That § 34-23A-1 be amended to read as follows:

34-23A-1. Terms as used in this chapter mean:

 (1) "Abortion," the use of any means to intentionally terminate the pregnancy of a ~~female~~ woman known to be pregnant with knowledge that the termination with those means will, with reasonable likelihood, cause the death of the fetus;

 (2) "Fetus," the biological offspring, including the implanted embryo or unborn child, of human parents;

 (3) "Fertilization," that point in time when a male human sperm penetrates the zona pellucida of a female human ovum;

 (4) "Human being," an individual living member of the species of Homo sapiens, including the unborn human being during the entire embryonic and fetal ages from fertilization to full gestation;

 (5) "Medical emergency," any condition which, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant ~~female~~ woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function;

 ~~(4)~~ (6) "Parent," one parent of the pregnant minor or the guardian or conservator of the pregnant ~~female~~ woman ;

 ~~(5)~~ (7) "Physician," a person licensed under the provisions of chapter 36-4 or a physician practicing medicine or osteopathy in the employ of the government of the United States or of this state;

 ~~(6)~~ (8) "Probable gestational age of the unborn child," what, in the judgment of the physician, will with reasonable probability be the gestational age of the unborn child at the time the abortion is planned to be performed.

Section 9. That § 34-23A-10.3 be amended to read as follows:

34-23A-10.3. The health department shall publish, in culturally sensitive languages, within ~~sixty~~ one hundred eighty days after July 1, ~~1993~~ 2005 , the following printed

materials in such a way as to ensure that the information is easily comprehensible:

(1) Materials designed to inform the pregnant woman of all the disclosures enumerated in section 7 of this Act;

(2) Materials designed to inform the ~~female~~ pregnant woman of public and private agencies and services available to assist a ~~female~~ pregnant woman through pregnancy, upon childbirth and while the child is dependent, including adoption agencies, which shall include a list of the agencies available and a description of the services they offer; and

~~(2)~~ (3) Materials designed to inform the ~~female~~ pregnant woman of the probable anatomical and physiological characteristics of the unborn child at two-week gestational increments from the time when a ~~female~~ pregnant woman can be known to be pregnant to full term, including any relevant information on the possibility of the unborn child's survival and pictures or drawings representing the development of unborn children at two-week gestational increments. Such pictures or drawings shall contain the dimensions of the fetus and shall be realistic and appropriate for the stage of pregnancy depicted. The materials shall be objective, nonjudgmental, and designed to convey only accurate scientific information about the unborn child at the various gestational ages.

The materials shall be printed in a typeface large enough to be clearly legible and shall be available at no cost from the ~~health department~~ Department of Health upon request and in appropriate number to any person, facility or hospital.

Section 10. If any court of law enjoins, suspends, or delays the implementation of the provisions of section 7 of this Act, the provisions of § 34-23A-10.1, as of June 30, 2005, are effective during such injunction, suspension, or delayed implementation.

Section 11. If any court of law finds any provisions of section 7 of this Act to be unconstitutional, the other provisions of section 7 are severable. If any court of law finds the provisions of section 7 of this Act to be entirely or substantially unconstitutional, the provisions of § 34-23A-10, as of June 30, 2005, are immediately reeffective.

_____